☑ FILED ___ ENTERED
___ LOGGED ___ RECEIVED
11:18 am, Sep 11 2023
AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR SEARCH AND SEIZURE WARRANTS | Case No.  1:23-mj-02248-JMC  1:23-mj-02249-JMC |

**AFFIDAVIT IN SUPPORT OF A
CRIMINAL COMPLAINT AND SEARCH WARRANTS**

Your affiant, Special Agent (SA) Reese Stewart, of the Drug Enforcement Administration (DEA) being duly sworn, deposes and states as follows:

**I.     INTRODUCTION**

1. Based on the facts set forth in this affidavit I submit that there is probable cause to believe that Davonte WRIGHT and Edward PARTLOW, among others, are distributing and conspiring to distribute controlled substances in violation of 21 U.S.C. §§ 841 and 846 ("the **SUBJECT OFFENSES**").

2. I submit this affidavit in support of warrants authorizing the search of the following vehicles (collectively, the **SUBJECT VEHICLES**) described more fully in Attachments A-1 and A-2, to seize the items described in Attachment B:

   a.   **SUBJECT VEHICLE 1**: a 2006 Jeep Liberty bearing Maryland registration 31225CF and VIN 1J4GL58K56W142014, further described in Attachment A-1. **SUBJECT VEHICLE 1** is registered to Davonte Lamar Wright at 2605 Thompson Drive, Marriottsville, Maryland 21104.

   b.   **SUBJECT VEHICLE 2**: a 2016 Nissan NV200 bearing Maryland registration 7EW5107 and VIN 3N6CM0KN8GK700293, further described in Attachment A-2.

1

**SUBJECT VEHICLE 2** is registered to Walter David Reed Sr.[1] at 6303 Seton Ridge Drive Baltimore, Maryland 21207.

3. The **SUBJECT VEHICLES** are currently in the custody of the DEA at a location in Baltimore City, Maryland.

4. Based upon the evidence gathered to date, and my training, knowledge and experience, I submit that there is probable cause to believe that evidence of violations of the SUBJECT OFFENSES will be found within the **SUBJECT VEHICLES**.

II. **AFFIANT AND EXPERTISE**

5. I am a law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

6. I have been a DEA Special Agent since June 2019. I am currently assigned to the Baltimore District Office, High Intensity Drug Trafficking Area Group 54, which investigates drug trafficking organizations and their ties to violence. I was previously assigned to the DEA Los Angeles Field Division Enforcement Group 2, which is tasked with marijuana eradication efforts and investigates drug trafficking organizations connected to Mexican-based drug cartels. I received 16 weeks of training in narcotics investigations and related legal matters at the DEA Training Academy in Quantico, Virginia.

7. Prior to DEA, I was a Border Patrol Agent with the United States Border Patrol from March 2008 to December 2011. As a Border Patrol Agent, I conducted law enforcement duties pertaining to narcotics and human smuggling along the border between the United States and Mexico. From December 2011 to June 2019 I was employed as a Deportation Officer with Immigration and Customs Enforcement,

---

[1] The connection of Reed to Davonte WRIGHT, if any, is unknown.

in which I conducted immigration and firearms investigations. From June 2017 to June 2019, I was a Task Force Agent with the Drug Enforcement Administration Group D-51 in Portland, OR, in which I participated in narcotics investigations targeting Mexican drug trafficking organizations.

8. I have also participated in numerous investigations that have utilized court-ordered interception of wire and electronic communications as an investigative tool. Therefore, I am familiar with the lawful use of electronic and wire surveillance equipment in investigations of distribution of CDS. Through these experiences, I have listened to numerous drug-related conversations and become familiar with jargon related to the distribution of CDS. I have also debriefed numerous defendants, cooperating witnesses, and others who have had experience in the manufacturing, packaging, and distribution of CDS. Consequently, I am familiar with the phraseology and practices of those that abuse and illegally distribute CDS.

9. I have directly and/or indirectly participated in the arrest of numerous persons for violations of CDS laws, during which time officers have seized various amounts of heroin, cocaine, marijuana and other illegal substances. I have been involved in the preparation and/or execution of well over 100 search and seizure warrants.

10. Through training and experience in drug trafficking investigations and arrests, I have become familiar with the actions, traits, habits, and terminology utilized by drug traffickers. I am familiar with the ways in which narcotic traffickers conduct their business, including methods of importing and distributing narcotics, money laundering, the use of cellular telephones and the Internet to facilitate their illegal acts, and the use of numerical codes and code words to conduct drug transactions. Based on this familiarization, I know the following:

   a. Drug trafficking is an ongoing and recurring criminal activity. As contrasted with crimes against persons, which tend to be discrete offenses. Drug trafficking is an illicit commercial activity that is characterized by regular, repeated criminal activity;

    b. Drug traffickers commonly compartmentalize members of their organization into discrete "cells," with specific members, responsibilities, and/or geographical territories assigned to each cell.  In that regard, I know that members of one cell commonly are provided with information only about their specific cell's criminal activities, thus limiting the information about the overall organization, and ultimately frustrating law enforcement efforts to dismantle the entire organization;

    c. Cellular telephones are an indispensable tool of the drug trafficking trade. Drug traffickers use cellular telephones, push-to-talk telephones, Short Message Service ("SMS"), electronic-mail, and similar electronic means and/or devices, often under fictitious names or names other than their own, in order to maintain contact with other conspirators.  In addition, drug traffickers will often change their cellphones following the arrest of a member of their DTO, or at random times in order to frustrate law enforcement efforts;

    d. Drug traffickers often place nominal control and ownership of telephones in names other that their own to avoid detection of those telephones by government agencies.  Even though telephones are in the names of other people, drug traffickers retain actual ownership, control, and use of the telephone, exercising dominion and control over them;

    e. Drug traffickers often arm themselves and their organization to protect their drug trafficking activities from rival drug traffickers;

    f. Drug traffickers keep controlled substances, as well as paraphernalia (to include packaging materials, cutting agents, scales etc.) on their persons, in their residences and/or curtilage, their automobiles, residences of family members, friends and associates, as well as their business locations, storage areas, and/or in the places of operation of their drug distribution activities, such as stash houses or safe houses;

g. Drug traffickers frequently keep and maintain records of their various activities. Such records frequently are kept to keep track of money owed to them by other drug traffickers and money that they owe to drug suppliers, and to maintain contact information for other drug traffickers and suppliers. Experience in similar cases has established that such records are frequently concealed in a suspects residence and/or curtilage, their automobiles, residences of family members, friends and associates, as well as their business locations, storage areas, and/or in the places of operation of their drug distribution activities, such as stash houses or safe houses, and that they take various forms. Documents commonly concealed by traffickers, include but are not limited to notes in code, deposit slips, wired money transactions, savings pass books, hidden bank accounts, various forms of commercial paper, personal address books, notebooks, records, receipts, ledgers, travel receipts (rental receipts, airline tickets, bus tickets, and/or train tickets) both commercial and private, money orders and other papers relating to the ordering, transportation, sale and distribution of controlled dangerous substances or other such documents which will contain identifying data on the co-conspirators. The aforementioned items are kept in locations that are considered safe by the drug traffickers and where they have ready access to them, such as safety deposit boxes, their residences, in their vehicles and on their person;

h. Drug traffickers, due to advancement in technology, may be utilizing computers or other electronic storage media, including cellular telephones, to store the records listed above;

i. Drug traffickers must maintain on hand large amounts of United States currency in order to maintain and to finance their ongoing narcotics business. Based on training and experience I know that persons involved in large scale drug trafficking conceal in their residences and/or curtilage, their automobiles, residences of family members, friends and

associates, as well as their business locations, storage areas, and/or in the places of operation of their drug distribution activities, such as stash houses or safe houses, currency, financial instruments, and evidence of financial transactions relating to narcotics trafficking activities;

      j.    Drug traffickers frequently utilize cellular telephones, pagers and other electronic communications devices to facilitate illegal drug transactions. Documents referencing the possession or use of cellphones, such as bills, cellphone boxes, receipts for phones or payment, etc., are of evidential value insofar as their evidence of a suspect's possession of a particular phone. Moreover, the electronically stored information on these devices is of evidentiary value in identifying other members of the drug trafficking conspiracy and establishing the relationship between these individuals. I know that drug traffickers often keep on their persons, in their residences and/or curtilage, their automobiles, residences of family members, friends and associates, as well as their business locations, storage areas, and/or in the places of operation of their drug distribution activities, such as stash houses or safe houses, cellular telephones and documents referencing the possession of those phones;

      k.    Drug traffickers frequently take or cause to be taken photographs of themselves, their associates, their proceeds, and their narcotics. Drug traffickers commonly have such photographs in their residences, vehicles, places of work, electronic devices, or on their person. In a criminal conspiracy case such as this, photographs of co-conspirators with one another is evidence of their association with one another and thus can be used as evidence of their participation in a common conspiracy;

      l.    Drug traffickers commonly have in their possession -- that is, on their persons and in their residences and/or curtilage, their automobiles, residences of family members, friends and associates, as well as their business locations, storage areas, and/or in the places of

operation of their drug distribution activities, such as stash houses or safe houses -- firearms and other weapons, which are used by the traffickers to protect and secure their narcotics and proceeds from loss to law enforcement agents or to other criminals who may attempt to steal money and drugs.

   m. Firearms are tools of the trade for drug traffickers.  Among other purposes, firearms are used to protect CDS, CDS proceeds, and territories under a drug trafficker's control.  They also are used as protection against rival drug traffickers.

## III. EVIDENCE OF DRUG TRAFFICKING BY DAVONTE WRIGHT

### Case Background

10. In 2022, DEA and the Baltimore Police Department (BPD) began investigating a Baltimore-based drug trafficking organization ("DTO") linked to a fatal overdose in Northern Virginia.  Based on evidence gathered to date, investigators believe that Jeremy BETHEA is a source of supply of cocaine and fentanyl in Baltimore City.  Timothy ADKINS is believed to be a source of supply of fentanyl to BETHEA.

11. Edward PARTLOW is an associate of BETHEA and a source of supply of cocaine and cocaine base (crack cocaine) to street-level dealers in the Sharp Leadenhall neighborhood and the Poe Homes public housing complex in Baltimore City ("Poe Homes").[2]  Investigators believe that PARTLOW and WRIGHT use 4314 Penhurst Avenue Baltimore, Maryland 21215 (Davonte WRIGHT's residence), as a stash location for drugs.[3]

12. As part of this investigation, law enforcement officers have interviewed confidential sources of information, conducted extensive surveillance (both in-person and remotely), and

---

[2] PARTLOW has prior state convictions for drug trafficking.  PARTLOW is believed to have residences at 2442 Barnesley Place in Windsor Mill, Maryland and 10050 Mill Centre Drive #370 in Owings Mills, Maryland.

[3] WRIGHT has felony convictions for CDS Possession with Intent to Distribute and a firearms violation.

conducted controlled purchases of CDS.  To date, investigators have purchased or recovered over 2,300 grams of suspected heroin/fentanyl and over 850 grams of cocaine from BETHEA and PARTLOW.

**Surveillance of PARTLOW and WRIGHT at 4314 Penhurst**

13. On August 2, 2023, at approximately 7:52 p.m., investigators, using a previously placed covert camera, saw PARTLOW arrive at 4314 Penhurst Avenue in Baltimore City in a red Acura.  PARTLOW knocked on the side door of the residence; Davonte WRIGHT opened the door and greeted PARTLOW.  The two then walked to the trunk of the red Acura and WRIGHT removed a black duffel bag.  Both PARTLOW and WRIGHT then entered the residence through the a side door.

14. On the same day at approximately 8:27 p.m., PARTLOW[4], contacted Deandre GREEN.  In that call, PARTLOW told GREEN, "At the same time I'm gonna get my shit back, what he gave me, I'm, I'm on a good…".  Later in the call PARTLOW told GREEN, "But when Fat-boy had came back, fat boy blessed, I'm thinking…"

15. Based on my training, knowledge, and experience, I believe that in this call PARTLOW told GREEN that he (PARTLOW) had just received a large quantity of cocaine from one of his sources of supply ("Fat-Boy," who is believed to be Travis HOWELL) and planned to use the proceeds to buy another car ("At the same time I'm gonna get my shit back, what he gave me, I'm, I'm on a good…").  Investigators know that PARTLOW's car was previously seized for non-payment and was scheduled for auction.  PARTLOW also informed GREEN that HOWELL had just received a large supply of cocaine ("But when Fat-boy had came back, Fat-boy blessed,

---

[4] On August 1, 2023, the Honorable Lydia K. Griggsby of the United States District Judge for the U.S. District Court for the District of Maryland, authorized the continued interception of wire and electronic communication over 410-446-5613, a telephone used by Edward PARTLOW.

I'm thinking…"). Based on this call and PARTLOW's arrival at 4314 Penhurst Avenue with a large black duffel bag at 7:52 p.m., I believe that PARTLOW received a large supply of cocaine from HOWELL which PARTLOW stored at the residence.

### Search Warrant at 4314 Penhurst Avenue

16. On August 15, 2023, the Honorable Brendan A. Hurson of the U.S. District Court for the District of Maryland, authorized a search warrant for 4314 Penhurst Avenue. On August 22, 2023, investigators executed the search warrant. WRIGHT was found at that location and was the sole adult occupant of the residence[5]. The **SUBJECT VEHICLES** were found parked on Gwynn Oak Avenue, in front of the side door that leads to the basement of the residence. Over the course of the investigation, investigators have seen PARTLOW access **SUBJECT VEHICLE 1** on occasion and have observed WRIGHT driving **SUBJECT VEHICLE 2** on at least one occasion. Investigators subsequently searched the residence and located five firearms, numerous matching magazines and ammunition, and a scale with suspected drug residue in the laundry room in the basement. Three of the firearms and the scale were concealed in the ceiling of the laundry room while the other two firearms were located on the water heater in the laundry room.

17. During a search of the residence, WRIGHT informed an investigator that his (WRIGHT's) cellular phone was in the basement on the couch, which an investigator retrieved. On a desk in the basement, investigators also located WRIGHT's wallet, which contained his Maryland driver's license and numerous payment cards issued to WRIGHT. On the same desk, investigators located the keys to **SUBEJCT VEHICLE 2** next to WRIGHT's wallet. In the interior stairwell leading to the basement, an investigator also located the keys to **SUBJECT**

---

[5] WRIGHT's minor children were in the residence at the time of the search.

**VEHICLE 1** next to a package addressed to WRIGHT at 4314 Penhurst Avenue in Baltimore, MD. Also in the basement, investigators located numerous additional pieces of mail addressed to WRIGHT at 2605 Thompson Dr. Marriottsville, MD 21104, the registered address for **SUBJECT VEHICLE 1**.

18. During the execution of the search warrant, an Officer with the Maryland Department of Public Safety and Correctional Services, and his K9 partner[6], conducted a scan of the exterior of the **SUBJECT VEHICLES**. The K9 alerted to the rear driver's side door of **SUBJECT VEHICLE 1** and to the driver's side of **SUBJECT VEHICLE 2**, indicating the presence of CDS.

19. While searching the residence, Shaqueal WADE-WRIGHT arrived to take custody of her two minor children[7]. WADE-WRIGHT stated that the **SUBJECT VEHICLES** belong to WRIGHT.

## V. CONCLUSION

20. Based on the foregoing, there is probable cause to believe that WRIGHT is engaged in the distribution of controlled substances and a conspiracy to distribute controlled substances, in violation of 21 U.S.C. §§ 841 and 846. I further submit that there is probable cause to believe that WRIGHT and PARTLOW are using the **SUBJECT VEHICLES** to store and distribute CDS in violation of 21 U.S.C. §§ 841 and 846. Accordingly, there is probable cause to believe that there will be found within the **SUBJECT VEHICLES** evidence, fruits, and instrumentalities of the aforementioned violations.

---

[6] The K9 is a certified drug detection dog who was last certified on March 21, 2023.
[7] WADE-WRIGHT and WRIGHT are the parents of the two minor children. They are currently married but in the process of obtaining a divorce.

21. WHEREFORE, in consideration of the facts presented, I respectfully request that this Court issue search warrants for the **SUBJECT VEHICLES** more fully described in Attachments A-1 and A-2, and authorize the search and seizure of the items described in Attachment B.

_____
Special Agent Reese Stewart
Drug Enforcement Administration

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 41 this  25   day of August 2023.

_____
The Hon. J. Mark Coulson
United States Magistrate Judge

